PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3631

_____

PLAINS ALL AMERICAN PIPELINE L.P.,
Appellant

v.

THOMAS COOK, in his capacity as the Secretary of Finance
for the State of Delaware; DAVID M. GREGOR, in his
capacity as the State Escheator of the State of Delaware;
MICHELLE M. WHITAKER, in her capacity as the
Audit Manager for the State of Delaware;
KELMAR ASSOCIATES LLC

_____

On Appeal from the United States District Court
for the District of Delaware
(District Court No. 1-15-cv-00468)
District Judge:  Honorable Richard G. Andrews

_____

Argued April 5, 2017

Before:  CHAGARES, SCIRICA, and FISHER,
*Circuit Judges*

(Opinion Filed: August 9, 2017)

Phillip B. Dye, Jr.
Deborah C. Milner
Vinson & Elkins
1001 Fannin Street
Suite 2300
Houston, TX 77002

Jeremy C. Marwell        **ARGUED**
Christian D. Sheehan
Vinson & Elkins
2200 Pennsylvania Avenue, N.W.
Suite 500 West
Washington, DC 20037

James E. O'Neill, III
Colin R. Robinson
Bradford J. Sandler
Pachulski Stang Ziehl & Jones
919 North Market Street
P.O. Box 8705, 17th Floor
Wilmington, DE 19801
        Attorneys for Appellant

Caroline L. Cross
Jennifer R. Noel
Delaware Department of Justice
820 North French Street
Wilmington, DE 19801

Marc S. Cohen
Loeb & Loeb
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA 90067

Tiffany R. Moseley
Steven S. Rosenthal          **ARGUED**
John D. Taliaferro
Loeb & Loeb
901 New York Avenue, N.W.
Suite 300 East
Washington, DC 20001

      Attorneys for Appellees Thomas Cook, David M.
      Gregor and Michelle M. Whitaker

Marc J. Phillips
Manion Gaynor & Manning
1007 North Orange Street, Tenth Floor
Wilmington, DE 19801

Stephen W. Kidder
Ryan P. McManus        **ARGUED**
Hemenway & Barnes
75 State Street, 16th Floor
Boston, MA 02109
        Attorneys for Appellee Kelmar Associates LLC

_____

OPINION OF THE COURT

_____

FISHER, *Circuit Judge*.

All states have laws authorizing them to seize private property through escheat, "a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears." *Texas v. New Jersey*, 379 U.S. 674, 675 (1965). But in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than reunite abandoned property with its owners. Delaware's Escheats, or Unclaimed Property, Law is no exception; as unclaimed property has become Delaware's third-largest source of revenue, companies have brought a wave of lawsuits challenging the constitutionality of Delaware's escheat regime.

In this case, Plains All American Pipeline ("Plains") seeks to attack the constitutionality of several provisions of the Delaware Escheats Law, as well as Delaware's demand that it submit to an abandoned property audit. But because Plains brought suit before Delaware assessed liability based on its audit or sought a subpoena to make its audit-related document requests enforceable, the District Court dismissed the suit, finding that Plains's claims were unripe except for an equal protection claim that it dismissed for failure to state a claim. Although we disagree with the District Court that Plains's as-applied, procedural due process claim is unripe and will therefore reverse and remand in part, we will affirm the District Court's dismissal in all other respects.

## I

## A

Rooted in a practice that dates back to feudal times, Delaware's Escheats Law is the mechanism by which Delaware takes custody of abandoned property in the State. As amended,[1] the law provides that a holder of "property presumed abandoned" must file a yearly report with the State Escheator in which it provides information about the property

---

[1] Delaware amended its Escheats Law while this case was being briefed. Effective February 2, 2017, the amendments adopt some meaningful changes, like limiting the look-back period of audits and expressly granting Delaware subpoena power to enforce audits. For ease of reference, we will cite to the new version of the statute, given that the basic framework of the law remains unchanged. In so doing, we express no opinion on whether the amendments would apply retroactively to the Plains audit as they do not affect our analysis.

5

and its possible owner. Del. Code Ann. tit. 12, §§ 1142, 1143. When filing the yearly report, the holder must "pay or deliver . . . the property described in the report" to the State Escheator, *id*. § 1152, who then takes custody of the property and may sell it.

To ensure compliance with the law, the statute permits the Escheator to "[e]xamine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with this chapter." *Id*. § 1171(1). And the "State Escheator may contract" with private third-parties to perform this audit on his or her behalf. *Id*. § 1178(a). If the person subject to examination "does not retain the records required," the "State Escheator may determine the amount of property due using a reasonable method of estimation." *Id*. § 1176(a). And if the State Escheator completes its examination and "determines that a holder has underreported unclaimed property due and owing," the State Escheator "shall mail a statement of findings and request for payment to the holder that filed." *Id*. § 1179(a). When liability is assessed, the State may charge interest and penalties. *Id*. § 1183. But the holder of the abandoned property may seek judicial review of the Escheator's decision in the Court of Chancery. *Id*. § 1179(b).

**B**

On October 22, 2014, Delaware's Audit Manager, Michelle Whitaker, sent Plains a notice that the State intended to audit its records from 1986 through present to evaluate its compliance with Delaware's Escheats Law. In that notice, Whitaker informed Plains that Kelmar Associates, a private auditing firm that conducts a large percentage of Delaware's unclaimed property audits, would conduct the audit; that she

6

was "the final arbiter of any disputes that may arise during the course of the examination"; and that the audit would be expanded back to 1981 if not completed by June 30, 2015. J.A. 200.

After Kelmar sent Plains its initial document requests, Plains sent a letter raising several constitutional objections to the audit and informing Whitaker that it would not respond to Kelmar. Dismissing Plains's concerns as unfounded, Whitaker responded that multistate audits were common and Delaware's actions were legal. She directed Plains to "produce the records requested" by Kelmar and noted that "the State will consider the level of [Plains's] cooperation when determining whether penalties should be assessed, or whether any other statutorily available actions should be taken, in connection with any past due unclaimed property that is identified as a result of the examination." J.A. 325.

Plains did not respond to Whitaker. Instead, it sued Kelmar, Whitaker, Delaware Secretary of Finance Thomas Cook, and Delaware State Escheator David Gregor in federal court for a declaration that the proposed audit violated the Constitution, an injunction preventing the defendants from pursuing the audit, and attorney's fees. In its initial complaint, Plains alleged that the proposed audit and portions of Delaware's Escheats Law violated the Fourth Amendment, as well as the Ex Post Facto, Due Process, Equal Protection, and Takings Clauses of the Constitution. But Plains later amended its complaint to add one claim that Kelmar conspired with Delaware to violate its rights and two claims that Delaware's Escheats Law was void for vagueness and preempted by federal law.

In July 2015, the Defendants moved to dismiss the amended complaint under Federal Rules of Civil Procedure

7

12(b)(1) and 12(b)(6). The District Court dismissed this case on August 16, 2016, finding that Plains's claims were all unripe except for an equal protection claim that it dismissed for failure to state a claim. This timely appeal followed.

## II

The District Court had federal question jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over both a district court's dismissal for lack of ripeness, *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 341 (3d Cir. 2001), and its dismissal for failure to state a claim under Rule 12(b)(6), *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). Where, as here, the defendants move to dismiss a complaint under Rule 12(b)(1) for failure to allege subject matter jurisdiction, we treat the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *NE Hub*, 239 F.3d at 341.

## III

On appeal, Plains argues that the District Court improperly dismissed six of its claims—four facial challenges and two as-applied challenges—as unripe.[2] This assertion

---

[2] In addition to dismissing the six appealed claims, the District Court also dismissed Kelmar from the suit, and Plains's Equal Protection, Ex Post Facto, and Takings Clause claims. It is well settled that an issue is waived and need not be addressed where, as here, the appellant "did not include any argument with respect to [it] or otherwise explain how the District Court erred." *Free Speech Coal., Inc. v. Att'y Gen. of United States*, 677 F.3d 519, 545 (3d Cir. 2012). We will accordingly affirm those dismissals.

8

requires us to consider whether Plains has presented a justiciable case or controversy.

**A**

While it is "emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), Article III of the Constitution limits the federal judiciary's authority to exercise its "judicial Power" to "Cases" and "Controversies." U.S. Const. art. III, § 2. This case-or-controversy limitation, in turn, is crucial in "ensuring that the Federal Judiciary respects the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted). And courts enforce it "through the several justiciability doctrines that cluster about Article III," including "standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 137 (3d Cir. 2009) (internal quotation marks omitted).

As the District Court noted, this case involves ripeness, "a matter of degree whose threshold is notoriously hard to pinpoint." *NE Hub*, 239 F.3d at 341. But because Plains is bringing a preenforcement action, the justiciability issue in this case can equally be described in terms of standing. *See, e.g.*, *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128 n.8 (2007) ("The justiciability problem that arises, when the party seeking declaratory relief is himself preventing the complained-of injury from occurring, can be described in terms of standing . . . or . . . ripeness"); *Free Speech Coal., Inc. v. Att'y Gen. of United States*, 825 F.3d 149, 167 n.15 (3d Cir. 2016) ("[W]hether Plaintiffs have standing or their claims are ripe . . . both turn on whether the

9

threat of future harm . . . is sufficiently immediate to constitute a cognizable injury."); *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) ("It is sometimes argued that standing is about *who* can sue while ripeness is about *when* they can sue, though it is of course true that if no injury has occurred, the plaintiff can be told either that *she* cannot sue, or that she cannot sue *yet*." (internal quotation marks omitted)).

At its core, ripeness works "to determine whether a party has brought an action prematurely . . . and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine." *Peachalum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003). Various concerns underpin it, including whether the parties are in a "sufficiently adversarial posture," whether the facts of the case are "sufficiently developed," and whether a party is "genuinely aggrieved." *Id.* at 433-34. In *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), the Supreme Court laid out two principal considerations for gauging ripeness including (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Id.* at 149. And in *Susan B. Anthony List v. Driehaus ("SBA List"),* 134 S. Ct. 2334 (2014), the Court illustrated that when evaluating ripeness as a matter of standing in preenforcement challenges,

we ask whether the plaintiff has "alleged a sufficiently imminent injury for the purposes of Article III." *Id*. at 2338.[3]

"In declaratory judgment cases, we apply a somewhat refined test" for ripeness, *Khodara Envtl., Inc. v. Blakely*, 376 F.3d 187, 196 (3d Cir. 2004) (internal quotation marks omitted), that was first articulated in our decision in *Step-Saver Data Systems, Inc. v. Wyse Technology*, 912 F.2d 643 (3d Cir. 1990). Under the *Step-Saver* test, we look to "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Khodara*, 376 F.3d at 196 (internal quotation marks omitted). But before applying it, two points warrant clarification.

First, although our *Step-Saver* test differs in form from the ripeness test articulated in *Abbott Labs*, or the standing test articulated in *SBA List*, it is merely a different framework for conducting the same justiciability inquiry. Since *Step-Saver* "simply alters the headings under which various factors are grouped," *Phila. Fed'n of Teachers v. Ridge*, 150 F.3d 319, 323 n.4 (3d Cir. 1998), we consider related claims for declaratory and injunctive relief under the same *Step-Saver* test in a case like this one. *See, e.g.*, *NE Hub*, 239 F.3d at 339-49. And when we apply *Step-Staver*, *Abbott Labs's* "hardship" and "fitness" factors still guide our analysis, as does the standing test set forth in *SBA List*.

---

[3] In *SBA List*, the Supreme Court also suggested that the prudential components of ripeness may no longer be a valid basis to find a case nonjusticiable. 134 S. Ct. at 2347. To the extent we discuss prudential ripeness factors, our holding does not rest on them; rather, our holding rests on the constitutional requirements of Article III.

11

Second, while the three *Step-Saver* factors "guide our disposition," *Step-Saver*, 912 F.2d at 647, they "are not exhaustive of the principles courts have considered in evaluating ripeness." *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992). As we have noted, "where the constitutionality of a state provision is at issue, the Supreme Court has taken into account the degree to which postponing federal judicial review would have the advantage of permitting state courts further opportunity to construe the challenged provisions." *Id.* (brackets and internal quotation marks omitted). And courts have also invoked the *Ashwander* principle, *see Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47, (1936) (Brandeis, J., concurring), to avoid "ruling on federal constitutional matters in advance of the necessity of deciding them." *Armstrong*, 961 F.2d at 413; *see also Renne v. Geary*, 501 U.S. 312, 324 (1991) ("It is not the usual judicial practice . . . to proceed to an overbreadth issue . . . before it is determined that the statute would be valid as applied." (internal quotation marks omitted)). With these principles in mind, we will analyze the justiciability of Plains's claims.

**B**

Four of the claims that are the subject of Plains's appeal are facial challenges—three allege that the estimation provisions of the Delaware Escheats Law are preempted, void for vagueness, and violate substantive due process, while the fourth alleges that the Delaware Escheats Law violates the Fourth Amendment by not affording precompliance judicial review of an auditor's document demands. The two as-applied claims at issue on appeal include a Fourth Amendment challenge to the scope of Kelmar's document requests and a procedural due process challenge to Kelmar's appointment to conduct the audit. For the reasons set forth

12

below, we agree with the District Court that Plains's four facial challenges and its as-applied Fourth Amendment claim are unripe.[4] But we disagree with its conclusion that Plains's procedural due process claim is not justiciable. In so holding, we will consider Plains's facial and as-applied challenges separately.

**Facial Challenges to the Estimation Statute**

*1. Adversity of Interest*

"Parties' interests are adverse where harm will result if the declaratory judgment is not entered." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1154 (3d Cir. 1995). As we have explained, when "the plaintiff's action is based on a contingency, it is unlikely that the parties' interests will be sufficiently adverse to give rise to a case or controversy within the meaning of Article III." *Armstrong*, 961 F.2d at 412-13. But "where threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune*, 549 U.S. at 128-29. Accordingly, "the party seeking review need not have suffered a completed harm to establish adversity"—it suffices that there is a "substantial threat of real harm and that the threat . . . remain real and immediate throughout the course of the litigation." *Florio*, 40 F.3d at 1463 (internal quotation marks omitted).

---

[4] In reaching these conclusions, we note that our decision today does not speak to the decision in *Marathon Petroleum Corp. v. Cook*, 208 F. Supp. 3d 576 (D. Del. 2016), which has been appealed and is pending before another panel of this Court. There, a different district judge found a preemption and as-applied Fourth Amendment challenge to the Delaware Escheats Law ripe.

Relying principally on *Abbott Labs* and our decision in *NE Hub*, Plains has taken the position that its interests are adverse to Delaware's because it is being forced to choose between complying with a burdensome law and risking serious penalties. While we agree that a challenge to government action is typically ripe when a party is faced with that dilemma, we simply cannot find that Plains confronts such a situation here.

Since estimation merely requires Plains to sit back and wait while Delaware calculates its liability, estimation is not a burdensome process "where the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967). And while one possible result of the estimation process—an arbitrary penalty—could harm Plains, that harm would only result after Delaware (1) concluded that Plains's records were inadequate, (2) used estimation, (3) found past-due abandoned property, and (4) erroneously calculated what was owed to the State. As such, the only alleged harm Plains could suffer from estimation is based on contingencies and its substantive due process, void-for-vagueness, and preemption claims lack both sufficient adversity for ripeness and a cognizable Article III injury. *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (noting that Article III standing requires a party to "have suffered an injury" that is "actual or imminent, not conjectural or hypothetical." (internal quotation marks omitted)); *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may

14

not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)).[5]

Unlike estimation, the average Kelmar audit can be quite burdensome, costing over one million dollars and spanning three to eight years. Pl. Am. Compl. ¶ 52, J.A. 51. And Plains maintains that those costs along with Delaware's warning that it would "consider the level of Plains's cooperation when determining whether penalties should be assessed," J.A. 325, have supplied adversity for its Fourth Amendment claims. Though we think the adversity inquiry is closer for Plains's challenge to the audit provisions of the statute than it is for its challenges to the estimation provisions of the statute, we still find adversity lacking for two reasons.

First, while "the requirement to go through a burdensome process can constitute hardship for the purposes of ripeness," *NE Hub*, 239 F.3d at 345, our precedent confirms that in all but those cases where the administrative process is at issue and imposes burdens that directly affect an entity's day-to-day business, the costs of administrative investigations are usually not sufficient, however substantial, to justify review in a case that would otherwise be unripe. *Compare Univ. of Med. & Dentistry of N.J. v. Corrigan,* 347 F.3d 57, 70 (3d Cir. 2003) (finding challenge to administrative process unripe where "the audit at issue" had "no direct effect on the plaintiffs' primary conduct" (internal quotation marks omitted)), *with NE Hub*, 239 F.3d at 342-46

---

[5] Plains responds that the State's refusal to disavow that it will engage in unlawful conduct creates a credible threat of harm. *See* Plains Br. 31-33. But that is not sufficient to make these claims justiciable. The "threatened enforcement" must still be "sufficiently imminent." *SBA List*, 134 S. Ct. at 2342.

(finding challenge to preempted administrative process ripe where subjecting plaintiff to it would affect whether and how plaintiff proceeded with significant construction project); *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998) ("[T]he Court has not considered . . . litigation cost saving sufficient by itself to justify review in a case that would otherwise be unripe."); *Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980) (noting the "substantial" burden on the company "of responding to . . . charges" is "different in kind and legal effect."). Contrary to Plains's arguments on appeal, the administrative process being challenged here does not present the circumstances required for administrative-process expenses to supply adversity. Unlike in *NE Hub*, the process at issue here is an "audit . . . directed only at past conduct," so "the only effects [Plains] will encounter are related to [its] participation in the investigatory process and actions that might be taken as a result." *Corrigan,* 347 F.3d at 70. Like in *Corrigan*, Plains does not argue that Delaware lacks the authority to conduct its audit; rather, Plains's preemption claim is directed at the statute's estimation provisions. And finally, in this case Kelmar's audit has not yet begun so it is wholly speculative whether the audit will be particularly burdensome and costly and result in an enforcement action. The extent of the burden is thus "conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).

Second, we do not believe Delaware's request to comply with the audit presents the *Abbott Labs* dilemma that exists when "a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to non-compliance." 387 U.S. at 153. Since this audit is an investigation confined to past conduct, it does not have the "direct effect" on "day-to-day

16

business," *id*. at 152, that existed in *Abbott Labs* when regulations imposed new obligations requiring the company to change labels, destroy stocks, and invest in new supplies. And we are not persuaded that Whitaker's letter attaches serious penalties to Plains's decision not to comply with the audit. Even if we found that she threatened a penalty, since the penalty cannot be imposed without a finding of unclaimed property liability, Plains is not yet in a place where it must choose between submitting to the audit or facing penalties—it still has a third option where it could refuse to submit to the audit without incurring a penalty.

### 2. Conclusiveness

The next prong of *Step-Saver* considers whether the contest is based on "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical set of facts." *Florio*, 40 F.3d at 1463 (internal quotation marks omitted). In analyzing this factor, two concerns are paramount. First, we consider whether "the legal status of the parties" will "be changed or clarified." *Travelers*, 72 F.3d at 1155. Second, we ask "whether further factual development . . . would facilitate decision" or "the question presented is predominantly legal." *NE Hub*, 239 F.3d at 344.

On this prong, Plains argues that its facial challenges to the Escheats Law would result in a conclusive judgment because it presents predominately legal claims that require no factual development. We disagree. To prevail on its facial challenges, Plains must demonstrate that "no set of circumstances exists under which the [Escheat Law] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and while "predominantly legal questions are *generally*

17

amenable to a conclusive determination in a preenforcement context," *Florio*, 40 F.3d at 1468 (emphasis added), that does not mean they *always* are. As the Supreme Court's decision in *City of Los Angeles v. Patel*, 135 S. Ct. 2443 (2015), affirms, "when there is substantial ambiguity as to what conduct a statute authorizes," it may be "impossible to tell whether and to what extent it deviates from the requirements of the [Constitution]." *Id.* at 2450 (internal quotation marks omitted). And in such circumstances, evaluating the constitutional validity of the statute "is pre-eminently the sort of question which can only be decided in the concrete factual context of the case." *Id.* at 2449 (quoting *Sibron v. New York*, 392 U.S. 40, 59 (1968)).

As the Defendants note, Plains's constitutional challenges to the Escheats Law, like the facial challenges in *Sibron*, involve precisely the sort of case where "further factual development would significantly advance our ability to deal with the legal issues presented." *Corrigan*, 347 F.3d at 68 (internal quotation marks omitted). The Escheats Law contains no definition of what estimation entails, nor does it explain whether preenforcement review exists or what it looks like. Thus the statute is "susceptible to a wide variety of interpretations," *Sibron*, 392 U.S. at 60, and because we cannot yet state with certainty what conduct is authorized—let alone that only unconstitutional conduct is allowed—ruling on Plains's facial claims now would not result in conclusive judgment.[6]

---

[6] Indeed, Plains concedes in its reply brief that until we know whether the amendments apply to its audit and what the enforcement proceedings will look like, we lack sufficient information to determine whether enforcement proceedings would satisfy the Fourth Amendment. Reply Br. 26. And this

18

### 3. *Practical Utility*

Finally, the third prong of the *Step-Saver* test requires us to examine the utility of judgment. "Practical utility goes to whether the parties' plans of actions are likely to be affected by a declaratory judgment . . . and considers the hardship to the parties of withholding judgment." *NE Hub*, 239 F.3d at 344-45 (internal quotation marks omitted); *see also Step-Saver*, 912 F.2d at 649 ("One of the primary purposes behind the Declaratory Judgment Act was to enable plaintiffs to preserve the status quo before . . . damage was done . . . ."). It also examines whether entry of judgment "would be useful to the parties and others who could be affected." *Florio*, 40 F.3d at 1470.

While judgment in this case may be of interest to the other companies challenging this law, practical utility is not satisfied. Since estimation involves no action by Plains, and no unclaimed property fine is impending, Plains "would take the same steps whether or not it was granted a declaratory judgment." *Pittsburgh Mack Sales & Serv. v. Int'l Union of*

---

same issue plagues Plains's facial challenges to the estimation statute. Because in "other contexts and under other statutes, courts have routinely permitted the use of statistical sampling" to determine amounts owed to the government, *Chaves Cty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991), and because the Escheat Law does not provide a specific estimation method for us to evaluate, we would need to see which estimation processes are employed before we could determine that estimation violates substantive due process, is impermissibly vague in all its applications, or is inconsistent with federal common law and preempted.

19

*Operating Eng'rs*, 580 F.3d 185, 192 (3d Cir. 2009). And to the extent a declaratory judgment might spare Plains from a costly audit, a judgment before Delaware takes any further action would render the utility of a decision remote for the same reason a judgment would not be conclusive. Because the constitutionality of the Escheats Law appears to turn largely on how it is enforced, any decision now would not "clarify legal relationships so that plaintiffs (and possibly defendants) could make responsible decisions about the future." *NE Hub*, 239 F.3d at 345 (internal quotation marks omitted). Rather, in speculating how the law would be enforced, we would leave parties to guess whether Delaware could take the same actions in a different matter.

## As-Applied Claims

### 1. Fourth Amendment Claim

Unlike Plains's facial claims, Plains's as-applied Fourth Amendment claim satisfies the last two prongs of *Step-Saver*. A judgment on these claims would be conclusive. It would affect "the legal status of the parties" by determining whether Delaware can request the documents they demanded. *Travelers*, 72 F.3d at 1155. And further factual development is unnecessary—because Kelmar has already issued its document requests, we have "a set of facts from which" we can "declare the parties' rights based on those facts." *Id*. Practical utility is satisfied for similar reasons. Holding that the document requests are overbroad would affect what Plains turns over, so its "actions are likely to be affected by a declaratory judgment." *Step-Saver*, 912 F.2d at 649 n.9. And "entry of a declaratory judgment . . . in the instant case would be useful to the parties and others who could be affected," by providing some guidance on what documents may be requested during an audit. *Florio*, 40 F.3d at 1469.

20

Nonetheless, the fact that this claim satisfies these two prongs does not make it ripe—our precedent makes clear that "plaintiffs raising predominantly legal claims must still meet the minimum requirements for Article III jurisdiction," *Armstrong*, 961 F.2d at 421, and, for the same reasons Plains's facial Fourth Amendment claim lacks adversity, its as-applied Fourth Amendment claim does so as well. Again, in all but those cases where the administrative process is at issue and affects a plaintiff's primary conduct, the burden of an administrative investigation cannot usually itself confer Article III jurisdiction. And this is not an *Abbott Labs* situation. Whether put in terms of ripeness or standing, because the audit is not enforceable, and because its occurrence is still based on contingencies, Plains has not alleged a "sufficiently imminent injury" that would give rise to a justiciable case under Article III of the Constitution. *SBA List*, 134 S. Ct. at 2338.

### 2. *Procedural Due Process Claim*

Finally, we hold that the District Court improperly concluded that Plains's as-applied procedural due process

21

claim is not justiciable.[7] To establish a due process violation, all Plains must show is that it was required to submit a dispute to a self-interested party. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions . . . we believe that the denial of procedural due process should be actionable . . . without proof of actual injury."); *United Church of Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982) ("Submission to a fatally biased decisionmaking process is in itself a constitutional injury"). And because Kelmar has been vested with responsibility for conducting the Plains audit and has issued document demands, this claim satisfies all three *Step-Saver* prongs.

As with the as-applied Fourth Amendment claim, the conclusiveness and utility prongs of *Step-Saver* are satisfied. No further factual development is needed to address the merits of this claim, and a ruling on the merits would be

---

[7] On appeal, Cook, Gregor, and Whitaker argue that this claim was not raised below. We disagree. Plains's amended complaint specifically challenges Delaware's delegation of authority to Kelmar. Pl. Am. Compl. ¶ 116, J.A. 68 ("Kelmar has a large financial stake in the outcome of the audit and is not a neutral party."). And Plains reiterated its challenge to Kelmar's appointment in its opposition to the Defendants' motions to dismiss. S.A. 22 ("Plains has asserted claims for violations of procedural and substantive due process based on . . . Defendants' improper delegation of authority to Kelmar, allowing Kelmar to act in a quasi-judicial capacity . . . ."). Perhaps Plains could have been clearer. But its challenge to Kelmar's appointment was adequately raised below.

"useful to the parties and others who could be affected" given Delaware's widespread use of private auditors. *Florio*, 40 F.3d at 1470. In addition, given the nature of a biased adjudicator claim, adversity exists. Because the conduct being challenged by Plains is the appointment of Kelmar to conduct this audit, the harm alleged for this claim is not based on a contingency; it is based on conduct that has already occurred. Perhaps this arrangement is constitutional, as Delaware asserts, but that is a merits question. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing 'in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975))). Since all three *Step-Saver* elements are present, Plains's procedural due process claim is ripe and the District Court erred in dismissing it. *Travelers*, 72 F.3d at 1154.

## IV

Though Cook, Gregor, and Whitaker request that we affirm the District Court's dismissal of Plains's procedural due process claim on the ground that Plains has failed to state a claim under Rule 12(b)(6), we think it improper to do so. While we "may affirm a district court for any reason supported by the record," *Brightwell v. Lehman*, 637 F.3d 187, 191 (3d Cir. 2011), "[g]enerally, in the absence of exceptional circumstances, we decline to consider an issue not passed upon below." *Berda v. CBS Inc.*, 881 F.2d 20, 28 (3d Cir. 1989) (internal quotation marks omitted); *see also Singelton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). Here, the Delaware Defendants do not identify—nor can we discern—any exceptional circumstances. Thus we will remand this claim for the District Court to address it in the first instance.

## V

For the reasons set forth above, we will reverse the District Court's dismissal of Plain's procedural due process claim, and remand it for the District Court's consideration in the first instance. We will affirm the District Court's dismissal in all other respects.