PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-2554
_____

CHRISTOPHER "CHRISSY" SHORTER,

Appellant

v.

UNITED STATES OF AMERICA; JORDAN
HOLLINGSWORTH, Warden; CHRISTINE DYNAN,
Associate Warden; ROBERT HAZZLEWOOD, Associate
Warden; DR. MARANTZ, Chief of Psychology;
UNKNOWN PENA, Captain; OFFICER BITTNER,
Lieutenant, Special Investigative Supervisor; UNKNOWN
HAMEL, Counselor; CARL SCEUSA, MD/CCHP;
UNKNOWN BYRD, Unit Manager; UNKNOWN, PREA
Compliance Manager

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-19-cv-16627)
District Judge: Honorable Renee M. Bumb

_____

Argued on April 22, 2021

Before: AMBRO, RESTREPO, and RENDELL, <u>Circuit Judges</u>

(Opinion filed September 1, 2021)

Kelly J. Popkin **(Argued)**
Rights Behind Bars
276 Stratford Road
Brooklyn, NY 11218

Samuel Weiss
Rights Behind Bars
416 Florida Avenue NW, #26152
Washington, DC 20001

             Counsel for Appellant

J. Andrew Ruymann
United States Attorney's Office
970 Broad Street, Room 700
Newark, NJ 07102

John T. Stinson, Jr. **(Argued)**
United States Attorney's Office
402 East State Street, Room 430
Trenton, NJ 08608

             Counsel for Appellees

Kevin M. Costello
Harvard Law School
Center for Health Law & Policy Innovation
1585 Massachusetts Avenue
Cambridge, MA 02138

                Counsel for Amici Appellants Civil Rights
                Advocacy and Public Interest Organizations

Alexander L. Chen
T. Keith Fogg
Legal Services Center of Harvard Law School
122 Boylston Street
Jamaica Plain, MA 02130

                Counsel for Amici Appellants Former
                Corrections Officials

_____

## OPINION OF THE COURT
━━━━━━━━━━━━

AMBRO, <u>Circuit Judge</u>

Chrissy Shorter is a transgender woman who alleges she was stabbed and raped by a fellow inmate while in federal prison despite having warned prison officials repeatedly that she was concerned about being assaulted. She brought a *pro se* suit under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), claiming officials violated her Eighth Amendment rights by displaying deliberate indifference to the substantial risk that another inmate would

assault her. Invoking its authority under 28 U.S.C. §§ 1915 and 1915A, the District Court dismissed her complaint *sua sponte* before allowing her to serve the defendants.

Shorter argues on appeal that a *Bivens* remedy is available and that the District Court erred by ignoring relevant factual allegations and imposing a needlessly demanding standard on her *pro se* complaint. The Government responds that we should not recognize a *Bivens* remedy in this context.

Shorter has the better argument. Her case falls comfortably within one of the few contexts in which the Supreme Court has recognized a *Bivens* remedy. And because Shorter adequately pleaded a violation of the Eighth Amendment, the District Court erred in dismissing that claim so early in the proceeding. We therefore reverse the dismissal of the Eighth Amendment claim and remand.

## I. Background

Shorter is a transgender woman who has undergone hormone replacement therapy, meaning her body is "openly female."[1] J.A. at 81. In June 2015, she entered the Federal Correctional Institution, Fort Dix to begin a 96-month sentence for creating a fraudulent "tax services" firm. J.A. at 69; Gov. Br. at 3. Although prison officials were aware that Shorter was

---

[1] Because we assume the complaint's factual allegations are true at this stage, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000), we describe the facts as Shorter reports them. We take no position on whether she will be able to prove they are true after discovery.

4

transgender, they opted to house her in a room without a lock with 11 men. Prison officials screened her risk for sexual assault under the Prison Rape Elimination Act of 2003 ("PREA") regulations, and they concluded she was at "significantly" higher risk than other inmates because, among other reasons, she presented as transgender, was small in stature, and had previously been sexually assaulted at another prison facility. J.A. at 137–38. The screening report stated that Shorter "should not be housed with anyone perceived to be 'at risk' for sexual abuse perpetration" and would be monitored. *Id.* at 138.

Despite these concerns, officials continued to house Shorter in a room without a lock with 11 men. Worried this living situation put her at risk for sexual assault, she asked to move to a two-person cell instead, citing policies of the Bureau of Prisons ("BOP") that supported her position. After initially objecting to this request, the prison reversed course and moved her to a two-person cell.

But the move did not fix the problem: the new cell also had no lock and was the furthest cell from the officer's station. Shorter reported these issues to prison officials, along with other concerns about sexual harassment and assault, but they took no immediate steps to protect her. Instead, her counselor compounded the problem by assigning a sex offender as her cellmate. The sex offender was later removed from her cell, and Shorter followed up with a grievance to the warden.

A few days later, Shorter again expressed concerns about sexual assault and submitted a request to transfer to a different prison, along with a BOP Program Statement supporting her request. Demonstrating the depth of her

5

concern, Shorter requested a transfer from the low-security Fort Dix to a higher security facility, as she believed the latter would provide more protection against assault. The transfer request asserted that Fort Dix was a particularly dangerous facility for her because it holds an unusually large number of sex offenders and does not permit locks on cell doors. Although the prison's psychology department agreed Shorter should be transferred, she remained in the cell furthest from the officer's station while her request was pending.

Prison leadership took 17 days to act on Shorter's transfer request. On September 4, 2015, the BOP's Gender Identity Dysphoria Committee decided Shorter should be transferred because there were "security concerns due to" her gender dysphoria and "the physical layout" of Fort Dix could not "provide the same type of supervision as in other institutions." *Id.* at 106. Despite the apparent urgency of the situation, the warden took yet another 17 days before acting on the Committee's recommendation and submitting a transfer request to the central BOP office.[2]

Conditions in the prison only worsened as Shorter awaited transfer. She continued to submit written materials to prison officials detailing her concerns. And on October 5 and 8, 2015, the associate warden distributed two memoranda suspending certain inmate privileges due in part to the recent "significant increase in security issues involving staff and inmate assaults." *Id.* at 71, 108–109.

---

[2] The documents attached to Shorter's complaint suggest at least some portion of the delay may have been attributable to amendments she made to her transfer request.

6

On October 14, 2015, Shorter's fears became real. In the middle of the night, an inmate entered her cell, raped her, and cut her seven times. After Shorter reported the incident, she was placed in involuntary protective custody. The prison conducted what Shorter characterizes as a cursory investigation of the assault but did not substantiate her claims. On November 3, 2015, approximately two and a half months after her initial transfer request and four months after she first complained to prison officials about her living arrangement, officials finally transferred Shorter from Fort Dix. She completed her sentence in 2019 and was released from custody.

After exhausting administrative remedies, Shorter filed this *pro se* lawsuit alleging, among other claims, that prison officials (collectively, "Defendants") were deliberately indifferent to the risk she would be seriously harmed in violation of the Eighth Amendment. The District Court screened her complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), which provide that courts shall dismiss cases filed by prisoners proceeding *in forma pauperis* that fail to state a claim on which relief can be granted. The Court concluded Shorter had not stated an Eighth Amendment claim because she merely expressed "generalized fears of being at risk of sexual assault[,] . . . . but there were no specific threats against her that required the defendants to take measures to protect her." J.A. at 10. The Court therefore dismissed her claim *sua sponte* before defendants were served.[3] Shorter filed a *pro se* appeal and later obtained legal counsel.

---

[3] The District Court later dismissed Shorter's other claims under the Fifth Amendment and the Federal Tort Claims Act. She does not press those claims on appeal.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. "Our review of the District Court's sua sponte dismissal for failure to state a claim, . . . like that for dismissal under [Federal Rule of Civil Procedure] 12(b)(6), is plenary." *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000). We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). And because Shorter's complaint was filed *pro se*, we construe it liberally and hold it to "less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (internal quotation marks and citation omitted).

## III. Analysis

We analyze the viability of Shorter's complaint in two steps. First, we consider whether a *Bivens* remedy exists at all in the context of deliberate indifference to prison rape. Concluding that it does, we next consider whether Shorter's complaint, in particular, was sufficiently pled to survive dismissal at this early stage. *See Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018) ("*Bistrian II*") ("Whether a *Bivens* claim exists in a particular context is antecedent to the other questions presented.") (internal quotation marks and citation omitted).

## A. Availability of a *Bivens* Remedy in This Context

"*Bivens* is the short-hand name given to causes of action against federal officials for alleged constitutional violations." *Id.* In the case giving the doctrine its name, the Supreme Court held there is a cause of action for damages when a federal agent, acting under color of his authority, conducts an unreasonable search and seizure in violation of the Fourth Amendment. *Bivens*, 403 U.S. at 389, 397. The Supreme Court subsequently recognized a *Bivens* remedy in two other contexts: gender discrimination in the employment context in violation of the Fifth Amendment's Due Process Clause, *see Davis v. Passman*, 442 U.S. 228, 249 (1979), and certain types of prisoner mistreatment in violation of the Eighth Amendment's prohibition of cruel and unusual punishment, *see Carlson v. Green*, 446 U.S. 14, 16 n.1 (1980) (addressing a claim of deliberate indifference to a prisoner's serious medical needs).

In *Farmer v. Brennan*, 511 U.S. 825, 830 (1994), the Supreme Court applied *Carlson* in recognizing an Eighth Amendment damages claim nearly identical to the one at issue here, involving prison officials who failed to keep a transgender prisoner safe from sexual assault. The *Farmer* Court explained that the Eighth Amendment "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (internal quotation marks and citation omitted). Accordingly, the Court held "a prison official can[] be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement [if he or

she] knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. This includes liability for displaying deliberate indifference to a substantial risk that a prisoner will be attacked by other prisoners, because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (internal quotation marks and citation omitted).[4]

In *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017), the Supreme Court summarized the status of *Bivens* jurisprudence. The Court emphasized that, although the doctrine is a "settled," "fixed principle in the law" in certain spheres, "expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). The Court then prescribed a two-pronged inquiry for courts to follow in deciding whether to recognize a *Bivens* remedy. First, they must evaluate whether a case presents "a new *Bivens* context," meaning that it "is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* at 1859. The *Abbasi* Court named three previous cases in which a *Bivens* remedy has been recognized: *Bivens* itself, in addition to the above-referenced *Davis* and

---

[4] As we observed in *Bistrian II*, "[a]lthough the *Farmer* Court did not explicitly state that it was recognizing a *Bivens* claim, it not only vacated the grant of summary judgment in favor of the prison officials but also discussed at length 'deliberate indifference' as the legal standard to assess a *Bivens* claim, the standard by which all subsequent prisoner safety claims have been assessed." *Bistrian II*, 912 F.3d at 90–91 (citing *Farmer*, 511 U.S. at 832–49). We therefore concluded that the *Farmer* Court had "recognized" a *Bivens* damages remedy. *Id.* at 91.

*Carlson*. *Id.* at 1854–55. "[M]eaningful" differences from those recognized contexts may include

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id*. at 1860. If a case does not present a new *Bivens* context, the inquiry ends there, and a *Bivens* remedy is available. *Bistrian II*, 912 F.3d at 91–92. If, however, the case does present a new *Bivens* context, a court proceeds to the second step of the analysis and asks whether any "special factors counsel[] hesitation" in extending a *Bivens* remedy to that context. *Abbasi*, 137 S. Ct. at 1857–58 (internal quotation marks and citation omitted).

Defendants assert this case presents a new *Bivens* context and that special factors counsel hesitation before allowing a *Bivens* remedy here. Our Court's precedent in *Bistrian II* covers this argument. 912 F.3d at 89–94. In that case, we considered a *Bivens* claim from a prisoner who was beaten by fellow inmates after they learned he was cooperating with a prison surveillance operation. Like Shorter, Bistrian claimed prison officials had failed "to protect him from a substantial risk of serious injury at the hands of other inmates." *Id.* at 88. There, as here, the defendants contended Bistrian's claim presented a new *Bivens* context. We disagreed,

11

reiterating that under our case law and the Supreme Court's longstanding precedent in *Farmer*, a federal prisoner "ha[s] a clearly established constitutional right to have prison officials protect him from inmate violence" and has a damages remedy when officials violate that right. *Id.* at 90 (internal quotation marks omitted) (alteration in original).

Because Bistrian's claim was not meaningfully different from the claim at issue in *Farmer*, we concluded the latter case "practically dictate[d] our ruling" in the former. *Id.* at 91. So too here.[5] *Farmer* made clear, in circumstances virtually indistinguishable from our case, that an Eighth Amendment *Bivens* remedy is available to a transgender prisoner who has been assaulted by a fellow inmate. As

---

[5] After *Abbasi*, "lower courts c[an] no longer rely on their own prior precedents to recognize a *Bivens* remedy." *Mack v. Yost*, 968 F.3d 311, 319 (3d Cir. 2020) (citing *Bistrian II*, 912 F.3d at 95). "Unless the Supreme Court has recognized the context before, the context is 'new.'" *Id.* Our holding today does not run afoul of this precedent. We do not rely on *Bistrian II* to recognize a *Bivens* context the Supreme Court has not recognized. Instead, we rely on it solely for its holding that *Farmer*, which supplies the relevant *Bivens* context for our case, remains good law. And *Bistrian II* was undisturbed by the Supreme Court's subsequent decision in *Hernandez v. Mesa*, 140 S. Ct. 735 (2020), where the Court again referenced only *Bivens*, *Davis*, and *Carlson* as the cases in which a *Bivens* remedy has been recognized. *Hernandez*, 140 S. Ct. at 741–43. However, the reasoning in *Bistrian II*—that the Supreme Court in *Abbasi* neglected to name *Farmer* because it saw that case as falling under the umbrella of *Carlson*—applies equally to *Hernandez*. *See Bistrian II*, 912 F.3d at 91.

Shorter points out, her case and Farmer's both involved (1) transitioning transgender women on estrogen who had developed female physical characteristics, (2) who were housed in allegedly unsafe cells in the general population of all-male prisons where assaults were frequent, (3) who were physically and sexually assaulted by fellow inmates, even after (4) prison officials admitted "a high probability" that they "could not safely function" in the prison due to their transgender status, and (5) who alleged that prison officials had therefore been deliberately indifferent to their safety.[6] *Farmer*, 511 U.S. at 830–31, 848; Shorter Br. at 3–10. Defendants have pointed to no meaningful differences between the two cases.[7] And as we held in *Bistrian II*, *Farmer* remains good law. Our case therefore does not present a new *Bivens* context.

## B. Sufficiency of Shorter's Pleading

Defendants argue that even if a *Bivens* remedy is theoretically available in Shorter's case, it was nonetheless appropriate for the District Court to dismiss her complaint *sua sponte* at the screening stage under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) because she failed to plead a claim under the Eighth Amendment. We disagree.

---

[6] We do not suggest that this degree of factual similarity is required to conclude a case does not present a new *Bivens* context. But the extent of the factual overlap between Shorter's case and *Farmer* is indeed remarkable.

[7] Defendants cite the PREA as a potential distinguishing factor, but that statute, which cites *Farmer* favorably in its preamble, *see* 34 U.S.C. § 30301(13), does not make this a new *Bivens* context.

13

"At this early stage of the litigation," "[w]e accept the facts alleged in [Shorter's *pro se*] complaint as true," "draw[] all reasonable inferences in [her] favor," and "ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible Eighth Amendment claim." *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015). While it is proper for district courts to dismiss facially inadequate complaints *sua sponte* under 28 U.S.C. §§ 1915A(b) and 1915(e)(2)(B), premature dismissal under those statutes "deprives us of the benefit of defendant's answering papers" and may result in the "wasteful . . . shuttling of the lawsuit between the district court and appellate courts." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal quotation marks and citation omitted).

It was premature to dismiss Shorter's complaint at the screening stage. Construing her complaint liberally, accepting her factual allegations as true, and drawing all reasonable inferences in her favor, as we must, Shorter has stated an Eighth Amendment deliberate indifference claim. That type of claim has three components: "an inmate must plead facts that show (1) [s]he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to h[er] health and safety, and (3) the official's deliberate indifference caused h[er] harm." *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) ("*Bistrian I*"). Neither the District Court nor Defendants argue that Shorter failed to satisfy the first and third prongs; being sexually assaulted and stabbed indisputably pose a substantial risk of serious harm, and Shorter has alleged she was indeed harmed when she was assaulted.

14

Accordingly, only the second prong—whether the Defendants demonstrated "deliberate indifference to [Shorter's] health or safety"—is at issue. *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). "Deliberate indifference" is evaluated under a subjective standard; "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety" and disregarded that risk. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125, 132 (3d Cir. 2001). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (internal citation omitted).

Shorter has adequately alleged that the Defendants were deliberately indifferent to the substantial risk she would be sexually assaulted. First, her complaint alleges that she repeatedly told prison officials about the risks she faced at Fort Dix, campaigned to transfer facilities due to the unique threats posed by the layout and inmate population at Fort Dix coupled with her transgender status, and supplemented her grievances with specific references to supporting BOP policies. It is difficult to imagine what more an unrepresented inmate could do to make prison officials aware of her risk of sexual assault. The District Court faulted Shorter for making "generalized" complaints that did not memorialize any particular threats of sexual assault by a specific inmate. J.A. at 10. But construed in the light most favorable to Shorter, the complaint plausibly alleges her grievances were not "generalized"; she gave many specific reasons why she was at high risk for becoming a sexual assault victim. Further, a prisoner's "failure to give advance

15

notice [of the risk to her safety] is not dispositive," and a prison official may not "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843, 848.

Moreover, Shorter also alleged that the Defendants explicitly acknowledged her risk of sexual assault. Prison officials evaluated that risk when she first entered Fort Dix, and they concluded she was at "significantly" higher risk than other inmates due to a variety of particular factors that included her transgender status. J.A. at 69, 137–38. Officials later recognized that she needed to be transferred to a different facility because there were "security concerns due to" her gender dysphoria, and "the physical layout" of Fort Dix could not "provide the same type of supervision as in other institutions." *Id.* at 106. And in the days leading up to the attack on Shorter, prison officials posted notices throughout the prison warning about an increase in assaults. Yet Shorter alleges the prison did little to mitigate these concerns, keeping her in a dangerous cell far from the officers' station and even going so far as to place a known sex offender as her cellmate.[8]

To be sure, Shorter's claim may yet fail if the Defendants acted reasonably in response to the risk to her safety. *See Farmer*, 511 U.S. at 844 ("[P]rison officials who

---

[8] In holding otherwise, the District Court relied primarily on distinguishable, non-precedential, or out-of-circuit cases, most of which were decided much later in the litigation process at the summary judgment stage. *See* J.A. at 7–10.

16

actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). We express no opinion on that fact-intensive question. But Shorter has provided sufficient allegations of the Defendants' deliberate indifference to proceed to the next stage in the litigation.[9] *Cf. Hamilton v. Leavy*, 117 F.3d 742, 748 (3d Cir. 1997) (concluding that it was inappropriate to decide the reasonableness of the defendants' actions even at the summary judgment stage because there were genuine disputes of material fact). Dismissing Shorter's Eighth Amendment claim at the screening stage—before discovery and before Shorter even had the chance to serve process—requires a remand.

\* \* \* \* \*

Extending a *Bivens* remedy to a new context is a disfavored judicial activity. But Shorter's case does not require any extension of *Bivens*. Instead, her claim falls squarely within one of the *Bivens* contexts long recognized by the Supreme Court as discussed explicitly in our precedent. And Shorter's *pro se* complaint, liberally construed, has plausibly alleged a violation of the Eighth Amendment. We

---

[9] Defendants also argue we should affirm the dismissal of the complaint on qualified immunity grounds, an issue the District Court never reached. It is not obvious from the face of the complaint that qualified immunity applies, and we decline to reach this affirmative defense in the first instance. *See Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 545 (3d Cir. 2017) ("Generally, in the absence of exceptional circumstances, we decline to consider an issue not passed upon below.") (internal quotation marks, citation, and alteration omitted).

17

therefore reverse the dismissal of the Eighth Amendment claim and remand.